# CIRCUIT COURT OF LOUDOUN COUNTY

Sovereign Title Company

    v.

First Union National Bank

Case No. (Law) 21239

Robert E. Shaefer
and Renee C. Shaefer

    v.

First Union National Bank

Case No. (Law) 22407

April 20, 2000

BY JUDGE JAMES H. CHAMBLIN

These two cases came on for trial without a jury on March 27 and 28, 2000. For the reasons hereinafter stated, I find and rule as follows.

(1) In Case No. 21239, in Counts One and Four, the Plaintiff is entitled to a declaratory judgment that the lien of the Deed of Trust, which is the subject of this litigation, is released as to Lot 54, Beauregard Estates.

(2) As to Count Two in Case No. 21239, the lien as to Lot 54 is ordered to be released pursuant to Va. Code § 55-66.5.

(3) As to Count Three, in Case No. 21239, no judgment of forfeiture is granted under Va. Code §.55-66.3, as to Lot 54.

(4) As to Count Five, in Case No. 21239, I reverse my ruling from the bench on March 28, 2000, and a judgment of forfeiture is granted as to Lot 81, Beauregard Estates.

(5) As to Case No. 22407, a declaratory judgment is granted similar to that granted for Counts One and Four in Case No. 21239.

(6) No award of attorneys' fees and costs are made to any party. However, no attorney's fees and costs for either case are to be paid by Robert E. Shaefer and Renee C. Shaefer, who are completely innocent parties thrust into this litigation because of the failure of other parties to do what could have been easily done to avoid this litigation.

## Findings of Fact

In June 1996, the Regency Corporation ("TRC"), and several of its related entities including Regency Homes Corporation ("Regency"), entered into a Loan Agreement with First Union National Bank ("First Union"). First Union provided construction financing for homes to be built on various lots owned by the TRC related entities located in Maryland and Virginia.

As a part of the construction financing, Regency encumbered Lot 30, Beauregard Estates, Loudoun County, Virginia, by an Indemnity Deed of Trust, Assignment, and Security Agreement (the "Deed of Trust") dated June 28, 1996. The Deed of Trust secured the obligations of Regency to First Union under a Guaranty of Payment and Performance of the same date executed by Regency. By the Guaranty, Regency guaranteed the construction financing obligations of TRC to First Union in the original principal amount of $13,000,000.00.

By the financing arrangement, First Union financed funds for the construction by Regency of single family dwellings on various lots owned by Regency in Beauregard Estates. The Deed of Trust is, in essence, a construction loan deed of trust on the lots encumbered thereby. In addition to Lot 30, Regency encumbered Lots 81 and 54, Beauregard Estates, by Amendments to the Deed of Trust dated July 24, 1996, and October 30, 1997.

The crucial operative provisions of the Deed of Trust relating to the obligations secured and partial releases are discussed below.

*Lot 81*

Regency contracted to sell the house it built on Lot 81 to Mr. and Mrs. Pete A. Wallace. Both Regency and the Wallaces designated Sovereign Title Company ("Sovereign") as their settlement agent. Sovereign requested and received from First Union a written payoff statement for a partial release of Lot 81. Sovereign conducted the settlement in October 1996. Lot 81 was conveyed by Regency to the Wallaces by deed recorded October 28, 1996.

After settlement, Sovereign properly wired to First Union the payoff of $151,314.00 for Lot 81. At the same time, Sovereign forwarded to First Union a "Certificate of Satisfaction." See the letter dated October 28, 1996, from Cathy Strayhorne of Sovereign to Denise Gerber, Administrative Officer, First Union Corporation, admitted as Plaintiff's Exhibit 38. However, Sovereign never offered into evidence the "Certificate of Satisfaction" it forwarded to First Union.

First Union did not return an executed certificate of satisfaction or certificate of partial satisfaction for Lot 81 to Sovereign. On August 3, 1998, by letter of the same date, Anne Quante, of Sovereign forwarded a certificate of partial satisfaction to Gerber. See Plaintiff's Exhibit 41. There were problems with the certificate of partial satisfaction, and First Union referred the matter to counsel.

By fax on September 10, 1998, Strayhorne forwarded a revised Certificate of Partial Satisfaction for Lots 54 and 81 to Eric S. Schuster, counsel for First Union. See Defendant's Exhibit 15. There were problems with this certificate of partial satisfaction as well. The name of the lender was wrong and there were errors in the legal description.

Counsel for First Union prepared a certificate of partial satisfaction for Lot 81, which was executed by Claire M. Cline for First Union on September 18, 1998. See Defendant's Exhibit 16. The executed certificate of partial satisfaction was forwarded to Sovereign and duly recorded. The lien of the Deed of Trust as to Lot 81 has been duly released.

*Lot 54*

Regency constructed a single family dwelling on Lot 54. In 1997, Robert C. Shaefer and Renee C. Shaefer, his wife, contracted to buy Lot 54 from Regency. Regency and the Shaefers designated Sovereign to conduct the settlement.

Sovereign is owned 75% by Robert W. Hass, an attorney in McLean, Virginia, and a partner in the law firm representing the Plaintiffs in these

cases, and 25% by Strayhorne. In the spring of 1998, Sovereign had two employees who prepared for and did the settlements. They were Strayhorne, who was vice-president of Sovereign and oversaw its daily operations, and Terri Pellatt, a settlement coordinator. These two employees were doing 250 to 300 closings per year.

Sovereign handled Regency's closings in the Northern Virginia area. Sovereign was an experienced title company that handled many settlements on the sale of newly constructed homes.

Regency advised Sovereign that settlement was set on the sale of Lot 54 to the Shaefers for March 23, 1998. On March 12, 1998, Pellatt faxed a letter to Marilyn Reese, a construction loan administrator with First Union in Decatur, Georgia, requesting a payoff for Lot 54 and stating that settlement was scheduled for March 23, 1998. The payoff request was made pursuant to Va. Code § 6.1-330.82. Reese had been administering Regency's construction loan since September 1997. See Plaintiff's Exhibit 32.

On March 13, 1998, Reese faxed to Sovereign the written payoff for Lot 54 in the amount of $154,874.00. See Plaintiff's Exhibit 27. The pertinent provisions of the payoff statement are discussed in more detail below. The payoff included $151,874.00 which had been advanced as to Lot 54 plus a "premium" of $3,000 for the partial release as required by the Deed of Trust.

When First Union gave the payoff statement for Lot 54, the loan, as to that Lot, became "locked down," which meant that there could be no further advances on the construction loan without the approval of the appropriate bank officer. That officer was Claire M. Cline, a vice president of First Union in the Special Assets unit of the bank in Tysons Corner, Virginia.

After Regency's financial statement for 1997 showed a loss, the construction loan was transferred to the Special Assets Unit. Cline was in charge of the loan. In the spring and into the summer of 1998 First Union through Cline was working with Regency to resolve its financial problems.

Settlement on Lot 54 did not occur on March 23, 1998, because certain "punch list" items were not complete. The items not complete included installation of some trim and some painting, but "nothing major" per Ms. Shaefer.

In late March 1998, Regency requested two additional draws as to Lot 54. First Union "unlocked" the loan as to Lot 54, and on March 27, 1998, advanced $17,286.00 to Regency. On March 30, 1998, First Union advanced an additional $43,215.00 to Regency.

Sovereign did not advise First Union that settlement did not occur on March 23, 1998. Also, First Union did not advise Sovereign of the two additional advances totaling $60,501.00.

Despite Strayhorne's testimony at trial that she "believes" she called Reese in early April to tell her that settlement on Lot 54 had been delayed, I cannot find as a fact that she did so. Strayhorne testified on direct examination that she had not heard of Lot 54 until she went in to close on it on April 30, 1998. On cross-examination, she mentioned for the first time her belief. Also, in her deposition, she testified that she had "probably not" seen the payoff statement before closing, yet she testified at trial that she would have looked at the payoff statement when she called Reese in early April. Finally, Reese testified that no one called her in early April about a delay in settlement.

At some unknown time, but probably very close to settlement, Regency advised Sovereign that Lot 54 was ready to settle. Pellatt put the closing together in short order. The Shaefers were anxious to settle.

Pellatt testified that on the day of settlement (April 30, 1998) or the day before, she called Reese to verify the payoff and that Reese told her that the payoff was the same as in the original payoff statement. Reese testified that she did not receive such a phone call.

I find that Pellatt did not make the phone call to verify the payoff. She did not recall the specific conversation with Reese. Pellatt made notes of confirming other matters, e.g., that a wire payoff had been sent, but she made no note confirming the payoff as shown on the payoff statement. There were three to five settlements that day. The payoff statement from First Union was in the file. Pellatt hurried to put together the settlement papers. She left early, and Strayhorne conducted the closing after 5:00 p.m. with the documents prepared by Pellatt. Pellatt also knew that before Sovereign would disburse, Regency would have approved the settlement statement including the payoff. She would naturally assume that Regency would want the correct amount paid for the release. Finally, I feel that if Reese had received such a call, then she would have at least checked the computer and found that two extra advances had been made and would have provided another written payoff statement.

The next day, the documents were forwarded to Regency. They were received, approved, and returned by Regency to Sovereign. The HUD-1 settlement statement signed and approved by Regency shows the payoff of $154,874.00 to First Union (despite the $145,874.00 typo on page 3). See Plaintiffs' Exhibit 1.

The deed to the Shaefers for Lot 54 and the other required documents were recorded on May 4, 1998.

On May 6, 1998, Pellatt wired the sum of $154,874.00 to First Union to the attention of Marilyn Reese. The wire transfer authorization shows at least two changes in the lot reference to finally show Lot 54. The wire transfer was

received by First Union the same day, and a funds transfer credit confirmation was delivered to Reese. See Defendant's Exhibit 9.

The confirmation received by Reese showed it was for Lot 107, The Regency, which was another lot that was closed by Sovereign on April 30, 1998, for Regency. See Plaintiff's Exhibit 8. Regency's lender for Lot 107 was Ohio Savings Bank, not First Union.

When Reese saw the credit confirmation with a reference to Lot 107, she realized that it was in error because she had no payoff for Lot 107. Reese then called Sovereign and talked to Strayhorne.

Strayhorne and Reese testified differently about their telephone conversation on May 6, 1998. Strayhorne testified that Reese called merely to obtain the correct lot number and that she told Reese it should have been for Lot 54. Reese, according to Strayhorne, did not tell her that the payoff was short. On the other hand, Reese testified that she told Strayhorne that the payoff was short, to which Strayhorne replied that she should take it up with Regency.

I cannot find that Reese told Strayhorne that the payoff was short during their telephone call on May 6, 1998. Strayhorne had considerable experience in handling real estate settlements involving construction loan payoffs. She knew the importance of providing the correct payoff in order to obtain the needed release. If a lender advises that a payoff is short, then Strayhorne knew she had to do something quickly to get the correct amount to the seller's lender. It makes no sense to me that an experienced settlement agent when confronted with a short payoff would merely tell the lender to take it up with the seller. But it does make sense to me that First Union would have merely taken the shortage up with Regency when First Union was working with Regency on its financial problems. It makes no sense to me that Sovereign would have gone ahead with other settlements and disbursements to Regency if Strayhorne, a co-owner of Sovereign, knew of a shortage in the payoff for Lot 54.

Reese made notes of what she did when she realized that the payoff was short. See the second page of Defendant's Exhibit 9. She made two notes about calling to verify the lot number, but she made no note that she told Strayhorne that the payoff was short. She made a note that she called "Lisabeth" at Regency about the shortage and that "Lisabeth" told Reese she had send a check for the difference.

Reese could not have known that the payoff was short until Strayhorne told her that it was for Lot 54. It seems to me that if Reese did as she testified at trial, that while still on the telephone, she checked the computer after Strayhorne told her the correct lot, then Strayhorne would have remembered

that. Reese did not say anything about checking the computer while she was on the phone with Strayhorne until I asked her about it at trial.

I feel that Reese did not realize that the payoff was short until after her conversation with Strayhorne correcting the lot number. Reese then checked the computer and realized for the first time that the payoff figure and fees for Lot 54 did not include the two additional advances totaling $60,501.00. And then she did what she said Strayhorne told her to do — Reese called Regency directly to get the shortage. I think that Reese felt this was an appropriate thing to do because she knew First Union was working with Regency on its financial difficulties.

I think it is significant that in her pretrial deposition Reese, on direct examination by counsel for Sovereign, did not mention that she told Strayhorne in their May 6, 1998, telephone conversation that there was a shortage in the payoff. She did not mention it in her deposition until specifically questioned about it at a later time by counsel for First Union.

First Union offered to the Court the answer of Strayhorne on behalf of Sovereign to an interrogatory asking Sovereign to identify all communications between Sovereign and First Union related to Lot 54. In her answer, Strayhorne did not mention the May 6, 1998, telephone conversation. Strayhorne admitted that it was a mistake. This is no reason to disbelieve Strayhorne because First Union has always maintained that Reese did talk to Strayhorne on that date.

I find that the only thing discussed between Reese and Strayhorne on May 6, 1998, was the correct lot number.

After May 6, 1998, Reese called Regency two more times, but First Union never received a check from Regency for the shortage.

After May 6, 1998, Sovereign conducted several other closings with Regency or disbursed on pre-May 6, 1998, Regency closings. The seller's proceeds from these closings totaling over $300,000.00 were deposited in Regency's account at First Union.

On May 12, 1998, Reese, with approval from Cline, "cleared" the wire of May 6, 1998, and took the $154,874.00 as a partial payment as to Lot 54.

From May 6, 1998, to July 17, 1998, First Union never notified Sovereign in writing or otherwise of the payoff shortage. For business reasons, First Union elected not to exercise any of its rights to collect the shortage from Regency. Under the Deed of Trust, First Union had the right not to elect to exercise any remedies for a default.

On July 17, 1998, a judgment creditor of Regency served a garnishment summons on First Union. On the same day, Cline advised Sovereign not to pay anymore proceeds from any settlement to Regency. Additionally, the same

day Schuster (counsel for First Union) called Strayhorne to advise her of the payoff shortage. This was the first time Sovereign learned of the shortfall in the Lot 54 payoff.

Regency missed the interest payment due on the construction loan on July 1, 1998. By July 15, 1998, the loan became delinquent, which is an event of default under the Deed of Trust.

On July 30, 1998, TRC, Regency, and other related entities filed Chapter 7 bankruptcy petitions in the United States Bankruptcy Court for the District of Maryland, Northern Division. First Union accelerated the amounts owed under the construction loan agreement. First Union's claim exceeded $4,700,000.00.

On October 16, 1998, First Union and other creditors of the Regency entities entered into a Purchase and Sale Agreement (the "Agreement") with the bankruptcy trustee. Under the Agreement, First Union agreed to purchase from Regency all the lots still owned by it as collateral under the Deed of Trust in consideration of a credit bid against the claims of First Union against Regency in the amount of $4,644,711.50, being all the principal owed under the loan agreement to First Union. After the credit bid, First Union is still owed, by its computations, $507,930.67 in unpaid interest, late charges, attorney's fees, and other costs.

The Agreement was approved by order of the bankruptcy court and then effectuated as of November 6, 1998. As of that date, First Union claims Regency owes it the sum of $507,930.67. The bankruptcy proceeding is still pending.

Even though Sovereign forwarded a certificate of partial satisfaction to First Union for Lot 54, First Union has refused to execute it or otherwise release Lot 54. First Union intends to foreclose on Lot 54 under the Deed of Trust unless it is paid the sum of $507,930.67.

*Legal Analysis*
*Claims Asserted in Law No. 21239*

*Lot 81*

In Count Five of the Amended Motion for Judgment in Law No. 21239, Sovereign, as designee for Regency and as agent for Pete A. Wallace, Jr., seeks a judgment of forfeiture against First Union in the amount of $500.00 for its failure to timely deliver an executed certificate of partial satisfaction for Lot 81 pursuant to Va. Code § 55-66.3, plus an award of attorney's fees and costs incurred.

At the conclusion of the trial, I ruled from the bench that no relief would be granted because of First Union's delay in providing an executed certificate of partial satisfaction for Lot 81. Upon further reflection and consideration of the evidence and the law, I feel that I erred in my decision.

Counsel presented very little final argument as to Lot 81. That was understandable considering the much more serious issues involved with Lot 54. In deciding in favor of First Union, I felt that the delay in obtaining the executed certificate of partial satisfaction for Lot 81 was due to the errors made by Sovereign in the certificate or certificates it furnished First Union after paying the sum necessary for the release of Lot 81 from the Deed of Trust. Now, I feel that I should have carefully examined the duties imposed on a lien creditor under Va. Code § 55-66.3, before reaching my decision.

Va. Code § 55-66.3(A)(1) provides, in pertinent part, as follows:

> When payment or satisfaction is made of a debt secured by mortgage, deed of trust, vendor's lien, or other lien ... the lien creditor, unless he has delivered a proper release deed, shall, within ninety days after notice that the full or partial payment or satisfaction has been made, cause such payment to be recorded on a certificate of satisfaction or certificate of partial satisfaction in the clerk's office. Any lien creditor who fails to cause such recordation or to mail or deliver to the appropriate clerk's office, the obligor, or the obligor's designee an executed certificate of satisfaction and the note marked "paid" within the ninety-day period shall forfeit $500 to the lien obligor. Following the ninety-day period, if the amount forfeited is not paid within ten business days after demand for payment, the lien creditor shall pay any court costs and reasonable attorney's fees incurred by the obligor in collecting the forfeiture.

First Union, unless it had delivered a proper release deed, had an affirmative duty to cause an executed certificate of partial satisfaction for Lot 81 to be recorded within ninety days after notice that payment had been made or to mail or deliver to the appropriate clerk's office, Regency, or its designee, Sovereign, an executed certificate of partial satisfaction within the same ninety day period. There was no evidence that First Union delivered a proper release deed. First Union had notice that the required partial release payment was made by wire on October 28, 1996.

There is no evidence that within ninety days after October 28, 1996, First Union recorded an executed certificate of partial satisfaction for Lot 81 or

mailed or delivered one to the appropriate clerk's office, Regency, or to Sovereign.

There is nothing in the statute that places any requirement on the lien obligor, settlement agent, or any other person providing the payoff to provide a certificate of satisfaction that is correct or even one that is acceptable to the lien creditor. The duty to provide the executed certificate of satisfaction is on the lien creditor. If the lien creditor requires the payoff to be accompanied by a certificate of satisfaction, then the lien creditor does so at its own risk. The final obligation to record, mail, or deliver to the lien obligor the executed certificate of satisfaction is on the lien creditor.

The ninety day period expired without First Union forfeiting $500.00 to Regency, and it remained unpaid for the ten business days after Regency made a demand for payment of the forfeiture. The demand for payment was made when this suit was filed and served on First Union on September 9, 1998. Therefore, under the statute, First Union may be obligated to pay court costs and reasonable attorney's fees to collect the forfeiture.

First Union shall pay Regency's court costs in filing suit to collect the forfeiture. However, First Union shall not be obligated to pay reasonable attorney's fees because no evidence was admitted of Regency's attorney's fees or the reasonableness thereof.

Therefore, Sovereign as designee for Regency is granted a judgment of forfeiture against First Union in the amount of $500.00 and an award of court costs incurred in collecting the forfeiture.

*Lot 54*

In Counts One and Four of the Amended Motion for Judgment in Law No. 21239, the Plaintiff seeks a declaratory judgment that the lien of the Deed of Trust should be released as to Lot 54. In Count Two, the Plaintiff asks that the Court release the lien as to Lot 54 under Va. Code § 55-66.5. In Count Three, the Plaintiff seeks forfeiture of $500.00 under Va. Code § 55-66.3 for the failure of First Union to timely release the lien as to Lot 54.

Sovereign asserts that when it requested a payoff statement from First Union under Va. Code § 6.1-330.82, it had a right to rely on the written payoff statement provided by First Union in making the payoff for Lot 54. Sovereign places too narrow an interpretation upon the statute, and its argument is contrary to the opinion of its own expert.

Va. Code § 6.1-330.82(A) provides as follows:

> Where a lien on real estate is secured by a deed of trust or mortgage, the owner of such real estate, if entitled to prepay the obligation secured by such deed of trust or mortgage, shall be entitled to receive from the bank, savings institution, or other corporate entity holding such obligation, a written statement setting forth the total amount to be paid *as of a particular date* in order to obtain a release of the deed of trust or mortgage. The holder of the obligation secured by said deed of trust or mortgage shall mail or deliver such written statement of the payoff amount to the property owner or his designee within ten business days of the receipt of a written request for such payoff information from the property owner or his designee if the request contains the loan number and the address or other description of the location of the subject premises. Upon payment in full of the obligation, the holder shall promptly cause the cancelled loan documents to be forwarded to the owner or his designee. An inadvertent error made in the calculation of the payoff amount shall not release the party liable for payment of the obligation from the requirement to pay the full amount due under the contract of indebtedness, nor shall it release the holder of the contract of indebtedness from the requirement to return any overpayment to such party or his designee.

(Emphasis added.)

Sovereign requested a payoff for Lot 54 through March 25, 1998, with a settlement scheduled for March 23, 1998. First Union provided to Sovereign a written statement of the payoff amount to be paid as of the date requested, in order to obtain a release for Lot 54. It is undisputed that if First Union had been paid $154,874.00 on or before March 25, 1998, then it would have been obligated to release Lot 54. The payoff provided by First Union was accurate as of the "particular date" requested by Sovereign.

Despite the warnings in First Union's payoff statement that "payoff figures must be verified within 24 hours of closing," and "this payoff quote assumes there will be no additional principal advances ... between the date of the letter and the date of payoff," Sovereign, in a hurried need to get to settlement, did not verify the payoff for a settlement occurring over five weeks after the date for which the payoff was given. Va. Code § 6.1-330.82 affords no protection to Sovereign when it proceeded to settlement without getting an updated written payoff statement from First Union setting forth the amount to

be paid as of the date Sovereign intended to wire the payoff funds to First Union.

I do not agree with Sovereign that this is merely "an inadvertent error" as referred to in the last sentence of Va. Code § 6.1-330.82(A). The written payoff statement was accurate when given by First Union for the particular time frame requested by Sovereign. The advances made after the expiration of the time frame did not make the written payoff amount erroneous.

When Sovereign went to settlement on Lot 54, after the time frame for the written payoff and without verifying the payoff, it breached industry standards according to the testimony of its own expert, Paul C. Kincheloe, Jr., an experienced real estate attorney.

Sovereign is not protected in any way by Va. Code § 6.1-330.82(A) because it chose to settle using a stale, out of date written payoff statement without verifying its accuracy at settlement.

Even though the written payoff statement offers no protection to Sovereign, I hold that First Union's acceptance of the $154,874.00, paid on account of Lot 54 without advising Sovereign that it was an insufficient payoff for almost two and a half months, estops First Union from claiming that an additional $57,501.00 is due in order to release Lot 54.

In *Thomasson, Admin's v. Walker*, 168 Va. 247 (1937), our Supreme Court held:

> The general rule of equitable estoppel, or estoppel *in pais*, is that: (1) when a person, by his statements, conduct, action or behavior, concealment, or even silence; (2) has induced another person; (3) who has a right to rely upon those statements, etc.; (4) and who does rely upon them in good faith; (5) to believe in the existence of the state of facts with which they are compatible; (6) and act upon that belief; (7) the former will not be allowed to assert, as against the latter, the existence of a different set of facts from that indicated by his statements or conduct; (8) if the latter has so far changed his position that he would be injured thereby.

168 Va., at 256.

The issue involved has nothing to do with the amount owed by Regency to First Union on the construction loans and concerns only what is necessary to secure a release of Lot 54 from the lien of the Deed of Trust.

First Union was aware of the partial release provisions of the Deed of Trust. It was also aware that Sovereign was handling the settlement on the sale of Lot 54 by Regency to the Shaefers. It knew, or should have known, of

Sovereign's obligation to provide to the Shaefers, and their lender, a clear title free of First Union's lien. So First Union knew when it provided the payoff statement that Sovereign would be relying on First Union for correct information as to the amount needed to release Lot 54. When First Union received the sum of $154,874.00 from Sovereign for Lot 54, it knew, or should have known, that Sovereign was paying it in order to obtain the release of Lot 54.

It was completely unreasonable for First Union to delay over two and a half months in advising Sovereign of the shortage in the payment received on May 6, 1998, for Lot 54. I agree with the expert opinion of Mr. Kincheloe on this issue. First Union's acceptance of the $154,874.00 without telling Sovereign that it was insufficient, clearly led Sovereign to believe that the payoff was satisfactory. Sovereign had a right to rely on First Union's silence as an indication that the correct payoff had been tendered.

Sovereign had a good faith reason to rely on the acceptance of the $154,874.00 by First Union as the correct amount for the payoff because it corresponded to the amount in the payoff statement. There was no evidence that Sovereign was aware of anything more having to be done to the house causing the settlement delay other than certain punch list items. So, therefore, it would not be reasonable for Sovereign to have been on notice of possible additional advances totaling $57,501.00 on the construction loan. The punch list items as described by Mrs. Shaefer did not come close to the level of $57,501.00 worth of work to be done.

Sovereign had a good faith belief that it had tendered the correct payoff for Lot 54 to First Union when it accepted the funds without advising Sovereign of a shortfall. Sovereign in the due course of business disbursed the settlement proceeds to Regency in an amount that far exceeded the now claimed shortage.

Accordingly, First Union cannot, over two and a half months after it accepted the payoff consistent with its written payoff statement, assert against Sovereign that the payoff was insufficient. The injury to Sovereign if First Union were to do so is evident, *i.e.*, it had already disbursed all the seller's proceeds from the settlement for Lot 54 and Sovereign held no funds from the settlement to cover the shortage.

I think that First Union made a business decision to try to obtain the shortfall directly from Regency. Reese called "Lisabeth" at Regency on the day she learned of the shortfall to request a check for the shortfall. First Union elected for business reasons to pursue the shortage from Regency instead of the settlement agent. First Union's election turned out in hindsight to be a bad one. Sovereign should not have to suffer because First Union remained silent

(as to Sovereign) for business reasons and allowed Sovereign to proceed with the reasonable belief that a proper payoff had been tendered.

First Union had several choices when it ascertained the shortfall. It could have done any one or more of the following: (a) advise Sovereign immediately, while it still had funds due Regency from the settlement so Sovereign could attempt to obtain Regency's permission to pay the shortage to First Union, or, if Regency refused, interplead the shortage in court; (b) seek the shortage directly from Regency; or (c) set off the shortage against other funds on deposit by Regency with First Union.

First Union decided to pursue (b) and forego (a) and (c). Sovereign played no part in First Union's decision. Therefore, it is irrelevant why First Union made the decision. It makes no difference that First Union had the right not to exercise its remedies for a default or that there is no evidence that a setoff would have been effective. When (b) did not work and Regency missed the July 1998 interest payment and appeared headed toward bankruptcy, First Union then decided to pursue Sovereign. It comes too late. Sovereign had already changed its position, and any claim now made by First Union clearly is to the detriment of Sovereign.

Because First Union is estopped to deny the accuracy of the payoff received on May 6, 1998, the provision of the deed of trust that conditioned any partial release on Regency not being in default has no application. By Cline's testimony, Regency definitely became in default on July 15, 1998. This was two days after First Union first notified Sovereign of the shortfall. All the elements of estoppel had occurred or had come into being before Regency became in default.

For the foregoing reasons, the Plaintiff is entitled to a declaratory judgment that the lien of the Deed of Trust is released as to Lot 54.

In Count Two of the Amended Motion for Judgment, the Plaintiff applies to have the lien of the Deed of Trust released as to Lot 54 pursuant to the Va. Code § 55-66.5. For the reasons stated above, the Plaintiff has proven that the lien should be released. Therefore, pursuant to Va. Code § 55-66.5(A), the Clerk of this Court is ordered to execute and record a certificate of partial satisfaction which when recorded shall operate as a release of Lot 54 from the lien of the Deed of Trust.

The Plaintiff asks for an award of costs and reasonable attorney's fees under subparagraph C of Va. Code § 55-66.5, which provides that if the Court finds that the holder of the lien "unjustifiably and without good cause failed or refused to release" the lien, then the Court "*in its discretion, may* order that costs and reasonable attorney's fees be paid ...." (Emphasis supplied.) Although I think that the Plaintiff has made a good argument that First Union

may have unjustifiably and without good cause failed or refused to release the lien as to Lot 54, I cannot under all the circumstances grant such an award that will benefit Sovereign or Regency. Sovereign, by industry standards, should have verified the payoff with First Union; and, Regency's failure to pay what it rightfully owed led to this litigation.

I feel differently as to the Shaefers. Everyone recognizes that they are absolutely without fault, but they stood to lose their home because of the actions of others. Therefore, I direct that counsel for the Plaintiff shall not impose upon and shall not collect from the Shaefers any attorney's fees or costs related to this litigation. This attorney's fee and cost issue is discussed in more detail as to Case No. 22407.

In Count Three the Plaintiff seeks a forfeiture under Va. Code § 55-66.3, because First Union failed to record or deliver a certificate of partial satisfaction for Lot 54. Under the statute, the lien creditor has a ninety-day period to record or deliver an executed certificate of partial satisfaction after notice that partial satisfaction has been made. The crucial language of the statute is set forth above in the discussion of the statute and its application to Lot 81.

For purposes of the statute, I find that First Union did not have notice of the partial satisfaction as to Lot 54 until I rendered this opinion. Hence, the ninety-day period has not expired, and the lien creditor is not required to forfeit $500.00. The Plaintiff is denied any relief under Va. Code § 55-66.3.

### Claim Asserted in Law No. 22407

In Law No. 22407, the Shaefers assert in their Motion for Judgment for Declaratory Judgment that the bankruptcy proceedings involving TRC, Regency, and the other Regency entities show that First Union has been paid the principal advanced on the construction loan with respect to Lot 54 plus the "premium" of $3,000.00, which would require a release of the lot under the terms of the Deed of Trust.

The basis of the Shaefer's argument is the Agreement entered into on October 28, 1998, which was subsequently approved by the bankruptcy court and effectuated on November 6, 1998. First Union argues that the Agreement has nothing to do with Lot 54. I agree to a certain extent. First Union did not acquire Lot 54 under the Agreement because it had been conveyed to the Shaefers prior to the commencement of the bankruptcy proceedings. However, it is clear that the principal initially claimed by First Union to be due to it in the bankruptcy proceeding included $57,501.00 advanced in March 1998, but not repaid, as to Lot 54.

When the Agreement was effectuated, the credit bid of First Union equal to the principal due on the construction loan constituted, in effect, a payment of the principal, including the $57,501.00 advanced as to Lot 54. First Union's own internal records show that the $57,501.00 was credited as paid as to Lot 54. See second page of Defendant's Exhibit 10, a First Union "History Inquiry" that shows as of November 6, 1998, a payoff of $57,501.00 as to Lot 54. Cline admitted that the answer given by Reese on behalf of First Union to an interrogatory about what was owed as to Lot 54 was a mistake when Reese answered that $57,501.00 was owed as of June 2, 1999. See Plaintiff's Exhibit 44 (Interrogatory No. 14 and Answer to Interrogatory No. 14). Cline testified that over $507,000.00 was owed to First Union and secured by the Deed of Trust, but none of the over $507,000.00 included principal.

I find that the Agreement did affect Lot 54, and that, as a result of the Agreement, all the principal due as to Lot 54 was deemed paid by First Union as of November 6, 1998, when the Agreement was effectuated. I further find that the $3,000.00 "premium" for the partial release was paid as part of $154,874.00 wired to, and accepted by, First Union on May 6, 1998.

The Shaefers make an issue of the unenforceability of a bankruptcy default provision in the Deed of Trust and the other construction loan documents. I do not feel that this issue comes into play because Regency was in default prior to filing the bankruptcy petition for at least two reasons. First, a default occurred because of the 1997 financial statement of Regency showing a loss as testified to without contradiction by Cline. Second, Regency defaulted when it failed to timely pay the interest installment due July 1, 1998.

First Union asserts that the default by Regency is significant because the partial release provisions of the Deed of Trust are operable only if "no event of default has occurred and is continuing ...." See § 4.13 of the Deed of Trust. I think that First Union should not be allowed to assert the "no event of default" provision for the same reasons that it is estopped to assert a payoff for Lot 54 other than what it accepted on May 6, 1998, without advising Sovereign (the settlement agent for the Shaefers) for over two and a half months of the shortage in the payoff.

The Shaefers are entitled to a declaratory judgment in Law No. 22407 that the lien of the Deed of Trust is released as to Lot 54. The release as to Lot 54 as ordered in this case and as to Counts One and Four in Case No. 21239 will be effected by the certificate of partial satisfaction to be executed and recorded by the Clerk as the relief granted as to Count Two (under Va. Code § 55-66.5) in Case No. 21239.

As a part of the declaratory judgment in this case, for reasons expressed as to Count Two in Case 21239, I do not think that the Shaefers, completely

innocent parties, should be required to pay any attorney's fees or costs for this case, No. 22407. Therefore, no award of costs and attorney's fees is made in Case No. 22407, and I further order that counsel for the Shaefers shall not impose or collect from the Shaefers any attorney's fees or costs attributable to Case No. 22407. I feel that Sovereign, Regency, and First Union should pay attorney's fees and costs incurred in both cases because action on the part of either one of them could have easily averted this litigation. Sovereign could have easily verified the payoff for Lot 54. Regency which received over $300,000.00 in proceeds from the other sales at or about the time of disbursement as to Lot 54, and which clearly owed the $57,501.00 (Regency never disputed it was owed), could easily have paid it. And finally, First Union could have averted this litigation by immediately notifying Sovereign of the shortage when it still had funds from the settlement to cover the shortfall.

If there is any question about my decision as to attorney's fees and costs, please bear in mind that the underlying premise of my decision is that the Shaefers should not have to pay any attorney's fees and costs in either case. I would award attorney's fees and costs to the Shaefers from First Union, but only if I had similar authority to award them against Sovereign and Regency. Sovereign should not receive an award of fees and costs because of its culpability and failure to do something that it should have done to avoid this litigation.